UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:22-CV-00082-GNS-HBB

ESTHER KEEHN                                                                                        PLAINTIFF

v.

CLASSIC BOWLING GREEN, LLC et al.                                                    DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment (DN 23). The motion is ripe for adjudication.

### I.  STATEMENT OF FACTS AND CLAIMS

Plaintiff Esther Keehn ("Keehn") was employed at the BMW-Mercedes-Benz dealership in Bowling Green, Kentucky, from June 14, 2021, until March 25, 2022. (Keehn Dep. 40:9-12, 108:14-109:5, Dec. 12, 2022, DN 22-1). During her time at the dealership, Keehn alleges that she was sexually harassed by other employees—including Barry Massie ("Massie") and Robert Ogust ("Ogust"). (Compl. ¶¶ 8-28, DN 1-1) Keehn claims that her employer failed to address the harassment, and as a result of the harassment, she resigned and was constructively discharged. (Compl. ¶¶ 20-22, 29-31).

Keehn filed this action in Warren Circuit Court (Kentucky) against Defendants Classic Bowling Green, LLC ("CBG") and Mills Automotive Group, LLC ("Mills") (collectively "Defendants") alleging a sexual harassment and constructive discharge claims under Kentucky law. (Compl. ¶¶ 2-3, 23-31). Defendants removed the action to federal court. (Notice Removal,

1

DN 1). Following discovery, Defendants moved for summary judgment. (Defs.' Mot. Summ. J., DN 22).

## II.  JURISDICTION

This Court has jurisdiction over "any civil action brought in a State court of which the district courts of the United States have original jurisdiction" that is "removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). This Court has "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . the citizens of different States." 28 U.S.C. § 1332(a)(1).

## III.  STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party moving for summary judgment may satisfy its burden [of showing] that there are no genuine issues of material fact simply 'by pointing out to the court that the [non-moving party], having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.'" *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005) (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). Similarly, the movant may meet its burden by offering evidence negating an essential element of the non-moving party's claim. *See Dixon v. United States*, 178 F.3d 1294, 1999 WL 196498, at *3 (6th Cir. 1999). After the movant either shows "that there is an absence of evidence to support the nonmoving party's case," or affirmatively negates an essential element of the non-moving party's claims, the non-moving party must identify admissible evidence that creates a dispute of fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-

48 (1986). While the Court must view the evidence in a light most favorable to the non-moving party, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position [is] [] insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

### IV. DISCUSSION

#### A. Keehn's Employer

In moving for summary judgment, Defendants contend that Mills was not Keehn's employer and is entitled to dismissal of any claims asserted against it.[1] (Defs.' Mot. Summ. J. 5-6). The KCRA prohibits certain discriminatory actions by an "employer." KRS 344.040. The term "employer" is defined as "a person who has eight (8) or more employees within the state in each of twenty (20) or more calendar weeks in the current or preceding calendar year and an agent of such a person . . . ." KRS 344.030(2).

At the summary judgment stage, the Court must consider the evidence in the record and not mere allegations in the Complaint that Mills was Keehn's employer. (Comp. ¶ 23). In her response to Defendants' summary judgment motion, Keehn contends that Mills and CBG are joint employers and urges the Court to consider the factual circumstances surrounding Defendants' business relationship. (Pl.'s Resp. Defs.' Mot. Summ. J. 6-7).

The record reflects an affidavit from Jeffrey Cropp ("Cropp"), who is the director of corporate development for Mills, in which Cropp states that Mills does not have eight employees

---

[1] The Court previously denied Mills' motion for judgment on the pleadings on this same issue as premature. (Order, DN 15).

3

in Kentucky.[2] (Capps Aff. ¶ 5, DN 7-1; Cropp Dep. 6:16-17, May 10, 2023, DN 25-2). While Keehn urges the Court to probe the business relationship between Defendants based on the theory that Defendants were her joint employer, she fails to identify to any contrary evidence in the record to create an issue of fact as to whether Mills had the requisite minimum number of employees for the required period to satisfy the definition of an employer in KRS 344.030(2). (Pl.'s Resp. Defs.' Mot. Summ. J. 6-7). Accordingly, Mills is entitled to summary judgment on Keehn's KCRA and constructive discharge claims.

B. **KCRA Claim – Sexual Harassment Hostile Work Environment**

Keehn has asserted a claim of hostile work environment based on sex in violation of the KCRA.[3] (Compl. ¶¶ 23-28). To prove her *prima facie* claim, Keehn must prove that: "(1) she is a member of a protected class, (2) she was subjected to unwelcome sexual harassment, (3) the harassment was based on her sex, (4) the harassment created a hostile work environment, and that (5) the employer is vicariously liable." *Clark*, 400 F.3d at 347 (citing *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999)). In their motion, Defendants assert that Keehn has failed to prove the fourth and fifth elements of her *prima facie* claim. (Defs.' Mot. Summ. J. 7-20).

---

[2] While Keehn does cite to Cropp's deposition, his testimony relates to the interaction between the two businesses. (Pl.'s Resp. Defs.' Mot. Summ. J. 7 (citations omitted)). Keehn also relies on the testimony of Renee McGinnis ("McGinnis"), who was the controller at the dealership and who handled human resource functions onsite, but McGinnis testified that there were only between 29 and 36 persons employed at any given time by CBG, not Mills. (Pl.'s Resp. Defs.' Mot. Summ. J. 7 (citations omitted); McGinnis Dep. 16:17-25, Mar. 27, 2023, DN 25-1). The excerpts of McGinnis' testimony in the record do not contain any testimony regarding the number of employees of Mills.

[3] A sexual harassment asserted under the KCRA is analyzed the same as such a claim brought under Title VII of the Civil Rights Act of 1964. *See Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005) (citing *Ammerman v. Bd. of Educ. of Nicholas Cnty.*, 30 S.W.3d 793, 797-98 (Ky. 2000)).

A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Williams*, 187 F.3d at 561 (alteration in original) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1999)).

    1.    *Evidence*

        a.    **"Dan the Man" Letter**

In July 2021, Keehn received a letter in an envelope addressed to her at the dealership with a return address for someone in Alberta, Canada. (Keehn Dep. 59:1-23; Keehn Dep. Ex. 3, DN 22-1). The letter was written by a person using the pseudonym "Dan the Man" and contained sexually explicit content. (Keehn Dep. 58:2-15). When Keehn opened the letter, she was shocked and horrified by the letter. (Keehn Dep. 61:7-11). Keehn provided the letter to Joe Coffey, her direct supervisor at the time, who indicated that he would try to identify the source of the letter. (Keehn Dep. 51:2-3. 61:19-24). Keehn claims that nothing was ever done to determine the letter's origin, and she does not know if it was sent by anyone employed by CBG or Mills. (Keehn Dep. 61:25-62:11, 62:16-19).

As Defendants note in their motion, Keehn has failed to prove that any coworker or supervisor at the dealership sent this letter, and Keehn does not address the letter in her response. (Defs.' Mot. Summ. J. 18-19). Because Keehn cannot prove that this letter was sent by a coworker or supervisor and fails to address this evidence, Defendants are entitled to summary judgment on her KCRA claim to the extent that Keehn relies upon this letter. *See Sykes v. Dudas*, 573 F. Supp. 2d 191, 202 (D.D.C. 2008) ("[W]hen a party responds to some but not all arguments raised on a

5

Motion for Summary Judgment, a court may fairly view the unacknowledged arguments as conceded." (citation omitted)).

### b. Massie

Keehn also complains about the conduct of Massie. (Keehn Dep. 65:19-69:19). According to Keehn, she heard secondhand that Massie: (i) told coworkers that Keehn received a promotion because she had an affair with the general manager and his girlfriend; (ii) described online customer reviews of Keehn in a sexually graphic way to the receptionist at the dealership; and (iii) insinuated that Keehn sold vehicles by performing sexual acts for customers. (Keehn Dep. 65:19-67:6). Keehn testified that Massie had a reputation for being a pathological liar. (Keehn Dep. 75:1-12). Keehn reported Massie's conduct to Cropp, who investigated the matter. (Keehn Dep. 148:10-150:2).

During her deposition, however, Keehn conceded that Massie never sexually harassed her, and Defendants contend that she cannot prove her KCRA claim based on her allegations against Massie. (Defs.' Mot. Summ. J. 19). Like the letter, Keehn's response fails to address her allegations against Massie. Accordingly, Defendants are entitled to summary judgment to the extent that she is relying upon any harassment by Massie. *See Sykes*, 573 F. Supp. 2d at 202 (citation omitted).

### c. Ogust

Keehn instead bases her claim entirely upon the conduct of Ogust. Based on the record, his alleged sexual harassment of Keehn and her coworkers apparently occurred over a condensed time period within roughly two weeks after Ogust began working at the dealership. (McGinnis Dep. 44:13-14). Ogust was hired as the new general manager and began working at the dealership

6

on February 21, 2022.  (Keehn Dep. 98:15-18).  Keehn worked with Ogust for about 2½ weeks before she tendered her resignation on March 11, 2022, which was effective March 25, 2022.

### i. Behavior Towards Keehn

According to Keehn, Ogust's harassment began on his first day with him staring at her inappropriately by focusing on her breasts rather than her face when conversing.  (Keehn Dep. 89:11-20).  She testified that he also looked at her buttocks and legs.  (Keehn Dep. 89:20-21).  During the first few days, Keehn testified that Ogust made comments about her being a beautiful woman and that her photo on the dealership's website "didn't do [her] justice . . . ."  (Keehn Dep. 90:4-21).  On one of the days during his first week, Keehn testified that Ogust said "'Esther's looking beautiful as always today.'  You know, he'd compliment my outfit."  (Keehn Dep. 96:21-25).  During a sales meeting that week in which Keehn was the only female present, Ogust joked that he had installed a hidden camera in the women's bathroom at the dealership.  (Keehn Dep. 109:8-110:2).

Keehn described Ogust as refusing to be professional with her and always wanting to joke around because he wanted to be her friend.[4]  (Keehn Dep. 92:17-23).  In response, Keehn told Ogust to treat her like a man rather than a woman.  (Keehn Dep. 92:25-93:24).  She told him to be serious and not to joke with her when she was seeking feedback on how to improve in her role as the internet sales manager.  (Keehn Dep. 93:25-94:4).  According to Keehn, Ogust "laughed and [] said he's all about fun first and work second."  (Keehn Dep. 94:6-7).  Keehn testified that she had initiated this conversation with Ogust sometime during his second week because others had shared concerns about his conduct during his first week at the dealership.  (Keehn Dep. 95:15-20).

---

[4] When Ogust tried to add her as a friend on Facebook, Keehn did not accept the request.  (Keehn Dep. 92:24-25).

Keehn told Ogust that she was sensitive about these issues because of prior issues with management and shared with him the rumors at the dealership. (Keehn Dep. 95:21-96:3). Ogust apparently laughed and said that it "is very common in this business for females to get promoted by sleeping with upper management." (Keehn Dep. 96:5-9; *see also* Keehn Dep. 91:15-92:3).

Keehn also noted that Ogust punched her arm while walking by, kicked her leg as he walked by and made the statement "What's up, trouble?", and "would put his hand on [her]back when he walked by [her] . . . [l]ike move [her] aside . . . type of thing." (Keehn Dep. Dep. 97:3-16, 97:25-98:8). The physical contact led to Keehn confronting Ogust about his behavior. (Keehn Dep. 98:10-11). Keehn, however, denied that Ogust ever touched her breasts or groin. (Keehn Dep. 97:19-24).

During the first weeks of Ogust's employment, Keehn recalled the finance manager, Allen Arnold, telling her that Ogust wanted to have sex with her, which was corroborated by Kevin Murphy ("Murphy"), the general sales manager and Keehn's direct supervisor at that point, who was also part of that conversation. (Keehn Dep. 110:3-13). Keehn testified that Ogust made perceived advances towards her in the form of "the playful, borderline flirting, the punching, the kicking, the calling me trouble, looking at my body. He pretty much communicated very clearly with his body language that he was going to see how far he could take this." (Keehn Dep. 110:15-21). While Keehn claimed that Ogust made threats regarding her pay and reversal of custom sales after she rebuffed him, Keehn admitted that Ogust told that she was inappropriately double dipping by receiving a commission as the internet sales manager plus a commission for the sale. (Keehn Dep. 110:25-111:22). Keehn acknowledged that Ogust never told her that he took those actions because she refused his sexual advances. (Keehn Dep. 111:23-112:3).

Because of Ogust's conduct towards her, Keehn reported his behavior on more than one occasion to McGinnis.[5] (Keehn Dep. 98:21-99:3). During the first meeting with McGinnis, Keehn recalled making statements like "I'm not sure about this guy. He's so new. Am I being crazy, or is he weird and inappropriate?" (Keehn Dep. 99:3-6). As McGinnis recounted, Keehn reported that Ogust "was staring at her chest, touching her shoulder, hair, saying that . . . he saw potential in her, that it was creeping her out, you know, that he was saying that." (McGinnis Dep. 41:1-5). Keehn perceived from Ogust's comments that he was "coming on" to her. (McGinnis Dep. 41:9-10). According to Keehn, McGinnis said that they should give Ogust a little bit of time to "give him the benefit of the doubt." (Keehn Dep. 100:5-14).

In another meeting which occurred either during Ogust's first or second week at the dealership, Keehn told McGinnis that Ogust was acting inappropriately towards her and that she wanted to report his conduct. (Keehn Dep. 99:9-13, 99:25-100:4, 100:15-23). During that meeting, McGinnis shared with Keehn that other female employees had expressed concerns about Ogust's behavior making them feel uncomfortable. (Keehn Dep. 100:24-101:6). McGinnis also told Keehn that she had shared the concerns about Ogust's conduct with "HR of corporate." (Keehn Dep. 101:7-10). During this meeting, Keehn reported Ogust's inappropriate looking, the touching, and his request to "friend" her on Facebook. (Keehn Dep. 101:11-14).

Keehn's recollection was not clear about whether McGinnis followed up with her or whether Keehn initiated a later conversation about Ogust's conduct because McGinnis and Keehn frequently interacted in the performance of their work at the dealership. (Keehn Dep. 101:23-

---

[5] Keehn also testified that she shared her concerns about Ogust's behavior with Murphy within the first three days of Ogust' employment and continued to discuss the matter with Murphy. (Keehn Dep. 118:24-119:7). Keehn later told Murphy that she was resigning because of Ogust's sexual harassment but she had also told Murphy that was resigning to move to Arizona to be with her boyfriend. (Keehn Dep. 129:22-130:19, 132:1-10).

9

103:1, 105:5-15). Keehn believes that she told McGinnis that Ogust's behavior had not improved and others were still complaining about him. (Keehn Dep. 103:2-6). Keehn also testified that she may have told McGinnis things were better even though it was not true because Keehn "didn't want to cause any more problems." (Keehn Dep. 103:16-104:2).

At some point, McGinnis did convey to Keehn that a meeting had been held with Ogust in which he had called McGinnis "sugar." (Keehn Dep. 104:5-10). McGinnis reportedly told Ogust not to refer to her in such a way. (Keehn Dep. 104:10-13). Keehn was unsure whether Ogust was reprimanded during that meeting but believed that Keehn had conveyed the reports from female employees to Ogust. (Keehn Dep. 104:16-19). Overall, Keehn claims that McGinnis felt that her hands were tied in addressing Ogust's conduct and that CBG failed to protect her from Ogust.[6] (Keehn Dep. 112:4-21).

The last time Keehn met with McGinnis to discuss Ogust's conduct was on March 11, 2022, when Keehn tendered her resignation letter. (Keehn Dep. 104:22-25, 107:1-6). From that meeting, Keehn recalled:

> So I told her that I had that conversation with him and I said that he's afraid of me now because I threatened to report—well, I don't know if I threatened to his face to report him. But he stopped being inappropriate towards me directly as far as like comments and stuff. He'd still look at me. He'd still do stuff that I couldn't quite

---

[6] It is not clear when McGinnis shared Keehn's concerns with Cropp, who served as the director of corporate development. Cropp could not recall the specific timeline but believed it was early in Ogust' employment. (Cropp Dep. 22:9-15). Cropp testified that McGinnis shared Keehn's concerns that Ogust was making her uncomfortable by how he looked at her, and when Cropp received that report, he sought information regarding why Keehn felt uncomfortable. (Cropp. Dep. 23:9-22). Cropp said he would pass on the information to Ogust's direct supervisor, Kelly Alston ("Alston"), and did share the report with him. (Cropp Dep. 25:11-20). Alston agreed to address the matter with Ogust and did speak with both Ogust and Keehn within a few days after the complaint was received. (Cropp Dep. 25:21-26:8). Cropp stated that Alston reported back that there were unfounded concerns but that Keehn felt uncomfortable around Ogust. (Cropp Dep. 30:3-21). Cropp acknowledged receiving other reports of Ogust's behavior towards employees at the dealership. (Cropp Dep. 26:13-23).

> put my finger on, you know? But he stops being like action of blatant inappropriate because I had asked him explicitly to stop. . . . Yeah, he did stop.

(Keehn Dep. 107:16-25, 108:2-3). Thus, Keehn's testimony reflects that after she confronted Ogust about his inappropriate touching and sexual comments, that behavior had ceased by the time of her resignation. (Keehn Dep. 108:7-13). Nevertheless, Keehn resigned because she no longer felt comfortable or safe working at the dealership. (Keehn Dep. 108:14-109:2). While the resignation letter made no mention of the sexual harassment, Keehn testified that Ogust's conduct was the reason for her resignation and that she was moving back to Arizona to be with her boyfriend.[7] (Keehn Dep. 114:12-116:8).

### ii. Behavior Towards Other Female Employees

Keehn was not alone in her concerns about Ogust and was not the first person to express concerns to management. The first report regarding Ogust's conduct was received by McGinnis within days of him starting at the dealership. (McGinnis Dep. 38:15-19). According to McGinnis, the employee reported that he "was being creepy. That he was touching her, like, shoulders. Just his voice, things like that, was just making her uncomfortable." (McGinnis Dep. 38:25-39:2). McGinnis addressed the matter with him upon receipt of the report, and he reportedly was shocked and expressed remorse for how his actions were perceived. (McGinnis Dep. 39:10-18). Ogust promised to apologize to the coworker and refrain from any such conduct in the future. (McGinnis Dep. 39:18-20, 39:24). McGinnis warned him to not engage in any such conduct towards coworkers—especially women—at the dealership. (McGinnis Dep. 39:21-23). McGinnis recalled not receiving any further complaints from that employee about Ogust's conduct. (McGinnis Dep. 39:25-40:2).

---

[7] Keehn had previously told her coworkers that she intended to move back to Arizona in August, September, or October later that year anyway. (Keehn Dep. 117:21-119:11).

11

After McGinnis' first meeting with Keehn about Ogust's behavior, McGinnis met with Ogust to raise Keehn's concerns. (McGinnis Dep. 41:14-15). While Ogust denied starting at Keehn's chest, he admitted touching her shoulder. (McGinnis Dep. 41:16-21). Ogust offered to apologize to Keehn, and McGinnis directed Ogust to refrain from complimenting Keehn on anything except "serious work-related issues" and talking to Keehn unless it was work-related. (McGinnis Dep. 41:22-42:2).

While McGinnis believed that Keehn was satisfied with how the matter was addressed, McGinnis thought it was necessary to reach out to Cropp to inform him of the report in light of the two reports regarding Ogust's workplace conduct. (McGinnis Dep. 42:3-16). McGinnis thought Ogust was feeling putout that she had met with him twice to discuss complaints about his behavior, and she felt that someone else besides her needed to address Ogust's conduct with him. (McGinnis Dep. 42:24:44:6). McGinnis testified that she was unsure whether Cropp ever discussed the matter with Ogust. (McGinnis Dep. 44:7-9).

In that same several-week period at the beginning of Ogust's employment, McGinnis received a report from a third female employee who may have worked in the parts department. (McGinnis Dep. 44:10-14, 46:7-12). While McGinnis did not provide specifics, she stated that whatever Ogust did "creeped out" the employee and that employee felt like she could no longer interact with him. (McGinnis Dep. 46:12-19). A fourth female employee working in sales also complained during that timeframe. (McGinnis Dep. 47:6-11). By that point, all but one of the women working in the dealership—excluding the office staff—had complained about Ogust with similar complaints about "always the touching, the talk, the—way he came across, just things like—like that." (McGinnis Dep. 49:12-13, 49:20-22). Even McGinnis felt creeped out by Ogust

at times, but she testified that the conduct issues ended around the time Keehn tendered her resignation. (McGinnis Dep. 51:1-2, 106:23-25).

### 2. *Analysis*

"In analyzing the fourth element of a prima facie case, the Court must consider the totality of the circumstances to determine whether the plaintiff has shown that 'her environment was objectively hostile, and also that she subjectively perceived the environment to be hostile.'" *Perry v. AutoZoners, LLC*, 954 F. Supp. 2d 599, 609 (W.D. Ky. 2013) (quoting *Williams*, 187 F.3d at 564). As the Kentucky Supreme Court has noted:

> [H]ostile environment discrimination exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Moreover, the "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." As stated by the United States Supreme Court in *Harris v. Forklift Systems*, the harassment must also be both objectively and subjectively offensive as determined by "looking at all the circumstances." These circumstances may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

*Ammerman*, 30 S.W.3d at 798 (internal citations omitted) (citing *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993)); *see also Clark*, 400 F.3d at 351 ("While there is no bright line rule as to what constitutes a hostile work environment, the plaintiff's allegations must depict conduct that could be construed as pervasive enough to alter the conditions of her employment and to create an abusive situation."). As the Sixth Circuit has stated:

> It follows that "simple teasing [and] offhand comments . . . will not amount to discriminatory changes in the terms or conditions of employment," and that the statute does not provide an action for "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."

*Ault v. Oberlin Coll.*, 620 F. App'x 395, 400 (6th Cir. 2015) (alteration in original) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788 (internal quotation marks omitted).

While Ogust's conduct should not be condoned in terms of how he treated Keehn and other female employees, the record does not support a finding that the conduct arose to the level of severe or pervasive conduct. His conduct involved teasing and offhanded comments, statements about Keehn's attractiveness, and unwanted physical touching to her arm and leg. Keehn acknowledges, however, that Ogust never made contact with her breasts or private areas of her body. While Keehn claims that other employees told her that Ogust wanted to have sexual relations with her, Ogust never made such remarks directly to Keehn. Importantly, as noted above, Keehn conceded that the inappropriate touching and sexual comments had ceased by the time she submitted her resignation after she confronted Ogust, which was less than twenty days after he started at the dealership. (Keehn Dep. 107:16-25, 108:2-3, 108:7-13). Thus, even construing the evidence the light most favorable to Keehn, Ogust's conduct did not rise to the level of severe or pervasive to support her claim for a hostile work environment. *See Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 790 (6th Cir. 2000) (holding that simple teasing, offhand comments, and isolated incidents including a sexual advance did not amount to discriminatory changes in the terms and conditions of a plaintiff's employment); *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 102 (2d Cir. 2020) (affirming dismissal of a hostile work environment claim based on, among other things, statements that the harasser stared, sneered, and "cat-call[ed] and clap[ped]" at the victim); *Moret v. Geren*, 494 F. Supp. 2d 329, 342 (D. Md. 2007) (granting summary judgment on a hostile work environment claim where the harasser "sexually propositioned [the victim] while discussing her

14

salary and benefits; requested that she massage his nude buttocks; asked if she had strong fingers; forced her to speak on the phone with his son; suggested that she date his son; and, routinely leered at her, made comments about her appearance, and made comments about her make-up." (internal citations omitted)); *Johnson v. Tower Air., Inc.*, 149 F.R.D. 461, 469-70 (E.D.N.Y. 1993) (concluding "nine incidents of abusive language or obscene gestures over a two-week period [were] insufficient as a matter of law to give rise to a hostile environment claim" because they were not pervasive). Defendants are entitled to summary judgment on the hostile work environment claim.

    C.    **Constructive Discharge**

The parties also dispute whether Defendants are entitled to summary judgment on Keehn's constructive discharge claim. As argued by the parties, this claim is not a cause of action but is a means of proving an adverse employment action for a KCRA claim when an employee resigns rather than being terminated.[8] *See Logan v. Denny's, Inc.*, 259 F.3d 558, 568 (6th Cir. 2001) (citing *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 996 (6th Cir. 1996)); *see also Queen v. City of Bowling Green*, No. 1:16-CV-00131, 2018 WL 3520132, at *4 (W.D. Ky. July 20, 2018) ("Constructive discharge is not itself a cause of action." (citing *Starks v. New Par*, 181 F.3d 103, 1999 WL 357757, at *5 (6th Cir. 1999))). "The commonly accepted standard for constructive discharge is whether, based upon objective criteria, the conditions created by the employer's action are so intolerable that a reasonable person would feel compelled to resign." *Brooks v. Lexington-Fayette Urban Cnty. Hous. Auth.*, 132 S.W.3d 790, 807 (Ky. 2004) (quoting *Ne. Health Mgmt., Inc. v. Cotton*, 56 S.W.3d 440, 445 (Ky. App. 2001)).

---

[8] In her response, Keehn states that "[c]onstructive discharge is an adverse employment action under the Kentucky Civil Rights Act." (Pl.'s Resp. Defs.' Mot. Summ. J. 9 (citing *Brooks v. Lexington-Fayette Urb. Cnty. Hous. Auth.*, 132 S.W.3d 790, 807 (Ky. 2004))).

"The analysis for constructive discharge is very similar to that of a hostile work environment claim." *Calloway v. Univ. of Louisville*, No. 3:04CV389-S, 2006 WL 1523229, at *5 (W.D. Ky. May 25, 2006). As this Court has noted:

> "To demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) the employer . . . deliberately created intolerable work conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit." The Court must consider both the employer's intent, which can be shown by demonstrating that the employee's resignation was a foreseeable consequence of the employer's actions, and the employee's objective feelings, which involves examining whether the "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."

*Perry*, 954 F. Supp. 2d at 616-17 (internal citation omitted) (citation omitted). "The test deliberately 'sets a high bar,' as the law generally expects employees to remain on the job while pursuing relief from harassment." *McKelvy v. Sec'y of U.S. Army*, 450 F. App'x 532, 535 (6th Cir. 2011) (quoting *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 639-40 (7th Cir. 2009)). To determine whether a plaintiff satisfies this standard:

> [Courts] consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan*, 259 F.3d at 569 (citation omitted).

While Defendants repeatedly argue that Keehn's resignation letter lacks any reference to the creation of intolerable working conditions, Defendants take too narrow a view of the evidentiary record, and that omission alone is not dispositive of this issue. (Defs.' Mot. Summ. J. 21; Defs.' Reply Mot. Summ. J. 6, DN 26).

In opposing summary judgment on this claim, Keehn argues:

16

> During her resignation, Plaintiff explicitly told McGinnis that she would stay but for Robert. (Keehn Dep., p. 108). McGinnis acknowledged that reality and told Keehn that her hands were tied as far as taking any action against Ogust. Defendants knew that Plaintiff would quit if they failed to address Ogust's behavior and chose to keep him in place. A reasonable jury could find this knowledge shows that Keehn was intentionally pushed out.

(Pl.'s Resp. Defs.' Mot. Summ. J. 10). Just because Keehn told McGinnis the resignation was due to Ogust[9] does not mean that CBG knew Keehn would quit if it failed to address his conduct. McGinnis did share Keehn's concerns with Cropp, and Alston conducted an investigation, which included meeting with Ogust to address the behavior. (Cropp Dep. 23:9-22, 25:11-26:8); *see also Greenwood v. Delphi Auto. Sys., Inc.*, 257 F. Supp. 2d 1047, 1065 (S.D. Ohio 2003) ("The appropriateness of an employer's response depends on the frequency and severity of the alleged harassment. A response is generally adequate if it is reasonably calculated to end the harassment." (internal citation omitted) (citation omitted)). In addressing Defendants' motion, Keehn points to no other evidence to show that CBG knew that she would resign due to its failure to remedy the situation. "Conclusory statements unadorned with supporting facts are insufficient to establish a

---

[9] In particular, Keehn testified as follows:

> Q  And then it's your testimony that when you turned in your resignation on March 11th, you informed Renee what did you inform her on that date about Robert when you turned in your resignation?
> A  I told her that I can't work here anymore. He makes me uncomfortable. I don't feel safe here. I wish that corporate would do something. She agreed with me. She wished that corporate would do something. She said her hands were tied, she couldn't do anything. And I asked, I asked her explicitly, I said, "Will any action be taken?" And she said, "I don't know." And so I said, "Okay, then I'm going to resign," and I turned in my paper—oh, my letter of resignation. I told her I don't feel comfortable working here. And I told her I loved the job and I was really, really sad to do this. It was the first job that I actually loved and felt like I could make a career out of.

(Keehn Dep. 108:14-109:5).

factual dispute that will defeat summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) (citing *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

Keehn's argument also ignores her critical concession that the offensive conduct had largely ceased by the time she submitted her resignation. (Keehn Dep. 107:16-25, 108:2-3, 108:7-13). As a result, it was not objectively reasonable for Keehn to feel that she had to resign under these circumstances due to her confession that much of the offensive behavior had ceased by the time of her resignation. *See Good v. MMR Grp., Inc.*, No. 3:00CV-182-H, 2001 WL 1772120, at *6 (W.D. Ky. Dec. 4, 2001) ("Prior to Buvens' investigation on February 17, 1999, Plaintiff allegedly was subjected to severe harassment. She did not, however, resign until after the corrective actions had been implemented.").

Similar to the reason why her hostile work environment claim fails, Keehn has not proven a constructive discharge claim. *See Underhill v. Caudill*, 186 F. Supp. 2d 736, 741 (W.D. Ky. 2001) ("The working conditions had not risen to the level of a hostile work environment, let alone a workplace where one would feel compelled to resign."). Summary judgment is granted for Defendants on this claim.

### D. Punitive Damages

Finally, Defendants move for summary judgment on Keehn's claim for punitive damages. (Defs.' Mot. Summ. J. 21-23). Because her two causes of actions are being dismissed, it is unnecessary to address what remedies she could have pursued if those claims had proceeded to trial.

18

## V. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (DN 23) is **GRANTED**, and Plaintiff's claims are **DISMISSED WITH PREJUDICE**. The Clerk shall strike this matter from the active docket.

Greg N. Stivers, Chief Judge
United States District Court

May 3, 2024

cc: counsel of record